**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1369**

BAKERY & CONFECTIONARY UNION & INDUSTRY INTERNATIONAL PENSION FUND; TRUSTEES OF THE BAKERY AND CONFECTIONARY UNION AND INDUSTRY INTERNATIONAL PENSION FUND,

> Plaintiffs – Appellees,

> v.

JUST BORN II, INCORPORATED, d/b/a Goldenberg Candy Company,

> Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:16-cv-00793-DKC)

Argued: January 24, 2018                    Decided: April 26, 2018

Before AGEE, WYNN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Wynn and Judge Thacker concur.

**ARGUED:** David Boris Rivkin, BAKER & HOSTETLER, LLP, Washington, D.C., for Appellant. Julia Penny Clark, BREDHOFF & KAISER, P.L.L.C., Washington, D.C., for Appellees. **ON BRIEF:** Jay P. Krupin, Mark W. DeLaquil, Elizabeth A. Scully, Richard B. Raile, BAKER & HOSTETLER LLP, Washington, D.C., for Appellant. Andrew D. Roth, BREDHOFF & KAISER, P.L.L.C., Washington, D.C., for Appellees.

AGEE, Circuit Judge:

Just Born II, Inc. ("Just Born"), a candy manufacturer, appeals the district court's judgment requiring it to pay delinquent contributions into the Bakery and Confectionary Union and Industry International Pension Fund (the "Pension Fund"), as well as interest, statutory damages, and attorneys' fees. It contends, first, that the district court misapplied the federal statute governing multiemployer pension funds in critical status and, second, that the court erred in holding that it had failed to plead adequately its affirmative defenses. For the reasons set out below, we affirm the judgment of the district court.

I.

Just Born and the Bakery, Confectionary and Tobacco Workers International Union, Local Union 6 (the "Union") were parties to a collective bargaining agreement (the "CBA") governing employment at Just Born's Philadelphia, Pennsylvania, confectionary plant from March 1, 2012, to February 28, 2015. The CBA required Just Born to contribute to the Pension Fund, which is an employee benefit plan and multiemployer pension fund governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461.[1] These contributions were to be "paid from the first day the employee begins working in a job classification covered by" the CBA. J.A. 27.

---

[1] In a multiemployer pension plan, "multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trustees of the Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 129 (2d Cir. 2012).

While the CBA was still in effect, the Pension Fund's actuaries certified it to be in critical status, a designation based on statutory guidelines indicating the potential that the Pension Fund's assets and expected contributions would be insufficient to meet its projected future obligations. *See* 29 U.S.C. § 1085(b)(2). A critical-status designation triggers statutory safeguards, including the requirement that the plan sponsor "adopt and implement a rehabilitation plan" designed to return the plan to financial stability and bring it out of critical status. § 1085(a)(2)(A).[2] To accomplish this objective, the rehabilitation plan must adopt revised schedules of reduced benefits and increased contributions. *See* § 1085(e).

As the plan sponsor, the Pension Fund's Board of Trustees developed a rehabilitation plan as required for multiemployer plans that are in critical status. In late 2012, Just Born and the Union selected a revised contribution schedule that, like the CBA, required Just Born to "contribute for every hour or portion of an hour, beginning on the first day of employment, that a person . . . works in a job classification that is covered by the" CBA. J.A. 60. In addition, the revised schedule required Just Born to increase its contributions to the Pension Fund by 5% each year. As a practical matter, because the CBA required Just Born to participate in the Pension Fund, the Fund's critical-status designation altered the nature of Just Born's obligations not only under its agreement with the Pension Fund, but also under its CBA with the Union.

---

[2] The plan sponsor of a multiemployer pension plan is the plan's joint board of trustees, or if there is not one, its administrator. 29 U.S.C. §§ 1002(16)(B)(iii), 1301(a)(10). The Pension Fund has a Board of Trustees, and it therefore is the plan sponsor here.

Just Born contributed to the Pension Fund under the revised schedule without incident until negotiations for a new CBA with the Union fell through. As part of the negotiations for a new agreement, Just Born demanded the new CBA not require it to contribute to the Pension Fund for newly hired employees. Citing concerns about the Pension Fund's solvency and management, Just Born proposed to contribute to a separate 401(k) plan for such new employees, but to continue contributing to the Pension Fund—which was still operating under the rehabilitation plan schedules—for existing employees.

The Union would not agree to those terms, and, as a result, Just Born declared a good-faith impasse. Relying on the principle from federal labor law that permits an employer to act upon a good-faith impasse, Just Born unilaterally implemented the terms of its last, best offer to the Union. *See AMF Bowling Co. v. NLRB*, 63 F.3d 1293, 1299 (4th Cir. 1995) ("When the parties are thus without a collective bargaining agreement, having made good faith efforts to reach one, the employer may impose its own terms and conditions of employment unilaterally."). Thus, while it continued to contribute to the Pension Fund under the rehabilitation plan for existing employees, Just Born contributed nothing to the Fund for newly hired employees. Instead, Just Born contributed to a separate 401(k) plan for any employee who began working after November 2, 2015.

The Pension Fund[3] filed a complaint in the United States District Court for the District of Maryland seeking to compel Just Born to contribute to it under the rehabilitation plan for all employees, including any new hires. It alleged that 29 U.S.C. § 1085(e)(3)(C)(ii) (governing subsequent contributions schedules for plans in critical status) (the "Provision"), coupled with the terms of the expired CBA and the agreed-to rehabilitation plan's revised schedules, required Just Born to continue making contributions for all employees, including those individuals hired after it declared an impasse.

In its amended answer, Just Born denied the applicability of the Provision and raised several affirmative defenses. Relevant to this appeal, Just Born contended that, once the CBA expired and the impasse occurred, it was not a "bargaining party" as defined by 29 U.S.C. § 1085(j)(1) and, thus, that the Provision did not apply to it. Further, Just Born asserted a series of affirmative defenses: fraudulent and fraudulently induced material misrepresentation; fraudulent and intentional material misrepresentation; unjust enrichment; unclean hands; and an unspecified defense of "legally defective and unlawfully imposed" critical-status determination, rehabilitation plan, and revised schedule. These defenses all centered on the theory that the Pension

---

[3] References to the Pension Fund as a party in this case refer to both plaintiffs: the Pension Fund and its trustees.

Fund defrauded and deceived Just Born into accepting the critical-status designation and its consequences.[4]

The Pension Fund moved for judgment on the pleadings on the issue of liability, and Just Born filed a cross-motion for judgment on the pleadings as to the entire case.

The district court held in favor of the Pension Fund, concluding that Just Born was liable for contributions to the Pension Fund for its newly hired employees. *See generally Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, Civil Action No. DKC 16-0793, 2017 WL 511911 (D. Md. Feb. 8, 2017). Relying on a plain reading of the Provision, the district court concluded it requires bargaining parties to an expired collective bargaining agreement to continue making payments consistent with the previously adopted rehabilitation plan and schedule. The court rejected Just Born's contention that the term "bargaining part[y]" did not apply to it because the company was no longer a party to an operative collective bargaining agreement. Under the district court's reading of the Provision, because Just Born "still was a bargaining party with respect to the expired" CBA, the statute applied to Just Born. *Id.* at *4. Consequently, the court concluded that unless Just Born could prove an affirmative defense, it would be liable to the Pension Fund for the delinquent contributions and associated costs.

---

[4] Although Just Born asserted four additional defenses, the district court characterized them as "speak[ing] to the merits" of the Pension Fund's claims and rejected them as part of the merits determination. Just Born does not raise a separate issue on appeal concerning those defenses, which are therefore not before us. *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, Civil Action No. DKC 16-0793, 2017 WL 511911, at *8 (D. Md. Feb. 8, 2017). We do not consider them as part of our review of the court's treatment of Just Born's affirmative defenses.

Turning to the affirmative defenses, the district court held that Just Born had failed to plead any of them with the particularity required for fraud-based allegations under Federal Rule of Civil Procedure 9(b).[5] First, the court observed that each defense was "dependent on [the Pension Fund] having fraudulently or intentionally misrepresented the Fund being in critical status as required or authorized by ERISA." *Id.* at *9 (internal alteration and quotation marks omitted). Second, it concluded that Just Born did not plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* at *10. And, although Just Born generally alleged that the Pension Fund's actuary "departed from 'sound actuarial principles' in evaluating the financial health of the Fund," *id.*, the district court noted that it was

> unclear whether [Just Born was] accusing the actuary of fraud by way of its certification or accusing the Trustees on the theory that they fraudulently induced [Just Born] to agree to a contribution schedule under the rehabilitation plan when they knew that the critical status was not based on reasonable actuarial assumptions.

*Id.* The court noted that Just Born referred alternately to "actions taken by the actuary, the Fund, or the Trustees." *Id.* In sum, these deficiencies made it impossible for the court to

---

[5] The district court alternatively held that Just Born's claims were inadequate under the *Twombly/Iqbal* pleading standard. As a threshold to that determination, it concluded it was appropriate to hold Just Born to that standard for its affirmative defenses because that was the majority view, it had been adopted in the District of Maryland, and Just Born had filed a cross motion for judgment on the pleadings. *See generally Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Although applicability of this standard to affirmative defenses continues to divide courts, we need not address it in this case because we resolve the issue under Rule 9(b).

determine what false representations Just Born relied upon or who made them, a fatal deficiency under Rule 9(b).

The district court therefore denied Just Born's motion, granted in part and denied in part the Pension Fund's motion, and gave Just Born approximately one month to file an amended answer. Just Born elected not to amend its answer and, instead, filed a joint motion with the Pension Fund to stipulate to judgment at a set monetary amount, reserving its right to appeal the district court's judgment as to liability.

The district court entered a final judgment awarding the Pension Fund $255,264.16 consisting of the agreed-to amount for delinquent contributions, plus interest, statutory damages, and fees. Just Born noted a timely appeal, and the Court has jurisdiction under 28 U.S.C. § 1291.

## II.

We review de novo the district court's grant or denial of a motion for judgment on the pleadings. *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014). The same standard applies to questions of statutory interpretation. *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009).

### A. The Pension Fund's Statutory Party Claim

Just Born first argues that the district court erred in concluding that the Provision required it to contribute to the Pension Fund for employees hired after the expiration of the CBA. In essence, Just Born contends that the Provision does not apply to it because the company is not a "bargaining party" with respect to newly hired employees in the

8

absence of an operative CBA. The Pension Fund responds that Just Born falls squarely within the Provision because it was a bargaining party to the expired CBA. We hold that the district court properly interpreted the statute and, accordingly, did not err in concluding that Just Born remained a "bargaining party" required to contribute to the Pension Fund under the rehabilitation plan schedule in effect, even after the CBA expired.

Congress enacted the Provision as part of the Pension Protection Act of 2006 ("PPA"), which amended ERISA to "help severely underfunded multiemployer pension plans recover." *Lehman v. Nelson*, 862 F.3d 1203, 1207 (9th Cir. 2017). The Provision states:

> If—
>
> (I) a collective bargaining agreement providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan . . . expires while the plan is still in critical status, and
>
> (II) after receiving one or more updated schedules from the plan sponsor . . . , the bargaining parties with respect to such agreement fail to adopt a contribution schedule with terms consistent with the updated rehabilitation plan and a schedule from the plan sponsor,
>
> then the contribution schedule applicable under the expired collective bargaining agreement, as updated and in effect on the date the collective bargaining agreement expires, shall be implemented by the plan sponsor beginning [180 days after the collective bargaining agreement expires].

§ 1085(e)(3)(C)(ii).

Under a plain reading of the Provision, the CBA's expiration does not alter Just Born's status as a bargaining party to that CBA. If Just Born was a bargaining party to the

9

CBA, it remains a bargaining party "with respect to" that CBA even after the CBA's provisions lapsed. Indeed, the Provision *only* applies after a collective bargaining agreement expires. That precondition is expressly set out in the first paragraph of subsection I: "If a collective bargaining agreement . . . expires." § 1085(e)(3)(C)(ii)(I). What follows are additional limiting criteria that are all framed within the context of an expired collective bargaining agreement. For example, the second paragraph refers to "the bargaining parties *with respect to such agreement*" § 1085(e)(3)(C)(ii)(II) (emphasis added). These "bargaining parties" can only be the bargaining parties to the expired collective bargaining agreement because that is the "such agreement" referred to in the statutory text. No other interpretation makes sense of all the words in the Provision.

Because the CBA's expiration cannot change Just Born's status as a bargaining party under the Provision, the only question is whether Just Born was ever such a party. It was, as Just Born acknowledges. And the remaining conditions of § 1085(e)(3)(C)(ii) are also satisfied, another fact Just Born does not challenge. That is, the CBA expired while the Pension Fund was in critical status and operating under a rehabilitation plan schedule, and Just Born and the Union—the bargaining parties to the expired CBA—"fail[ed] to adopt a contribution schedule" with terms consistent with an updated rehabilitation plan. With these preconditions met, the Provision requires the Pension Fund to implement the contribution schedule "as updated and in effect on the date the [CBA] expire[d]." *See* § 1085(e)(3)(C)(ii)(II). Thus, the plain language of the Provision requires Just Born to continue to contribute according to the revised schedule that applied at the time the CBA

10

expired, and that schedule, in turn, requires contribution for all employees: existing and new hires.

Contrary to Just Born's contention, this interpretation of the Provision does not render the word "bargaining" in "bargaining parties" superfluous. "Bargaining parties" is a statutorily defined term, and that definition determines an entity's status. *See* § 1085(j)(1)(A)(i) (stating, with certain exceptions not relevant here, that a "bargaining party" is "an employer who has an obligation to contribute under the plan"). It is Just Born's interpretation that would read "bargaining" out of the statutory language. As the district court aptly explained, Just Born's argument

> ignores the temporal element inherent in the reference. [Just Born] does not and could not suggest that it was never a bargaining party. Rather, it contends that it ceased to be a bargaining party when its obligation to contribute expired with the CBA. Even if that is true and [Just Born] is no longer a bargaining party, however, it still was a bargaining party with respect to the expired CBA. Hence, it is actually [Just Born]'s reading that would read words out of the Provision, applying it only to "bargaining parties" that *remain* "bargaining parties" without regard for the fact that the phrase "with respect to such agreement" necessarily includes *former* bargaining parties whose obligation to contribute has expired. Those former "bargaining parties with respect to" the expired CBA are indeed a subset of all "bargaining parties," and they are the subset identified in the Provision. Therefore, [Just Born] is a bargaining party in this context.

*Just Born*, 2017 WL 511911, at *4.

Just Born also contends that this interpretation of the Provision creates a *Hotel California*[6] scenario in which employers must contribute to a critical-status plan into perpetuity once a governing collective bargaining agreement has expired. In support of its

[6] The band Eagles tells us that at the Hotel California, "You can check out any time you like / But you can never leave!" Eagles, *Hotel California* (Asylum 1976).

argument, Just Born points to the Second Circuit's decision in *Trustees of the Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127 (2d Cir. 2012). Just Born posits that *Honerkamp* stands for the principle that employers must be allowed to leave a critical-status plan by invoking the statutory right to withdraw from a multiemployer plan, and that upon withdrawing, that employer no longer has a duty under the PPA to continue contributing to the plan. Just Born contends that the district court's interpretation of the Provision—and thus our interpretation of it—conflicts with *Honerkamp* and creates an irreconcilable conflict between the Provision and ERISA's withdrawal provisions because it would treat employers who have withdrawn to still be "bargaining parties" to an expired collective bargaining agreement and thus obligated to continue making contributions. We disagree.

*Honerkamp* involved a different issue: whether the PPA prohibited an employer from withdrawing from a multiemployer pension fund while the fund was in critical status.[7] There, the Second Circuit observed that "in enacting the PPA, Congress did not intend to prevent employers from withdrawing from multiemployer pension plans in critical status." 692 F.3d at 135. In doing so, the Second Circuit recognized that Congress' objective in enacting the PPA's provisions requiring *participating* employers to continue contributing to a critical-status plan is compatible with Congress' recognition

---

[7] The employer was obligated to contribute to a pension fund that was placed in critical status. *Honerkamp*, 692 F.3d at 132. When the employer reached an impasse with its union in negotiating a new collective bargaining agreement, the employer implemented its last best offer, "withdrawing from the [pension fund] in favor of [a] 401(k) plan." *Id.* at 133.

that *withdrawing* employers must pay a withdrawal liability because both requirements seek to ensure properly funded plans. *Id.* at 135–36.

Our interpretation of the Provision in no way limits the application of other ERISA provisions governing when and how an employer may withdraw partially or completely from an ERISA-qualified plan. *See Borden, Inc. v. Bakery & Confectionary Union & Indus. Int'l Pension*, 974 F.2d 528, 530 (4th Cir. 1992); *see also* 29 U.S.C. § 1381. Instead, our decision centers on what is required of employers who have not sought to withdraw, and who instead remain participants in the plan by virtue of an expired collective bargaining agreement. Here, Just Born has never sought to withdraw from the Pension Fund and our interpretation of the Provision does not limit its ability to do so. We simply recognize that the Provision applies to entities like Just Born that meet its requirements and have *not* exercised their option to withdraw. Just Born is attempting a de facto partial withdrawal from the Pension Fund by not covering new employees, which could lead to a complete withdrawal eventually over time through the attrition of its older employees. In so doing, Just Born is seeking to circumvent both the critical-status contributions for an expired collective bargaining agreement under the Provision and the withdrawal penalty under § 1381.

As the district court observed, Just Born

> seems to be trying to walk the line between [ERISA provisions], avoiding the contributions required under [the Pension Fund's] rehabilitation plan schedules while simultaneously avoiding [statutory] withdrawal liability by removing itself from the Fund by attrition, making each new hire an effective withdrawal without acknowledging withdrawal in a way that would trigger the withdrawal penalty.

13

*Just Born*, 2017 WL 511911, at \*6. ERISA does not allow Just Born this course. Just Born can either withdraw and pay the penalty for doing so, or remain and make the required payments under the Provision; it cannot avoid both obligations.

Just Born also maintains that this interpretation of the Provision undermines its right under federal labor law to enforce the last, best proposal when CBA negotiations reach an impasse. This argument derives from the National Labor Review Board's view that although an employer has a duty to negotiate in good faith, it does not have "an obligation to agree[, so w]hen the parties are . . . without a collective bargaining agreement, having made good faith efforts to reach one, the employer may impose its own terms and conditions of employment unilaterally." *AMF Bowling*, 63 F.3d at 1299. But this principle describes Just Born's obligations and rights only when negotiating with the Union. Just Born's obligations to the Pension Fund arise from a different authority: ERISA, including the PPA. The Provision, as part of the PPA, is a separate and independent statutory requirement under ERISA, distinct from the collective bargaining process between an employer and union. Our interpretation leaves unaffected Just Born's ability under labor law to implement its last, best offer so long as it does not contravene its statutory duties under the PPA.[8]

Under a plain-language application of the Provision to the facts of this case, Just Born is liable to the Pension Fund for continued contributions for all employees hired

[8] Because no other potentially conflicting duty is at issue in this case, we take no view on whether or when other legal principles may affect an employer's ability to invoke its last-and-best offer outside the specific context of ERISA.

after the declaration of an impasse, pending the execution of a new CBA in compliance with § 1085, the invocation of the withdrawal provisions, or some other statutorily required act. Accordingly, the Pension Fund was entitled to judgment on the pleadings so long as Just Born did not present a cognizable affirmative defense, the topic to which we now turn.

### B. Affirmative Defenses

Just Born contends the district court erred in requiring it to plead its affirmative defenses with the level of particularity required for pleading fraud under Rule 9(b). It argues that only two of its affirmative defenses were related to fraud and that those defenses were pleaded in the alternative as misrepresentation-based defenses. Accordingly, Just Born maintains the court held it to the wrong standard and, further, that its pleadings were sufficient under 9(b) to allege that the Pension Fund fraudulently claimed that the fund was in critical status for ERISA purposes because that determination was unwarranted.

We agree with the district court's reasoning that the Rule 9(b) standard applies to Just Born's affirmative defenses and that Just Born's allegations did not satisfy this standard. As an initial matter, we hold that defendants must satisfy Rule 9(b) when they plead affirmative defenses sounding in fraud. This conclusion arises from the plain language of Rule 9(b), which states, "In alleging fraud or mistake, *a party* must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added); *see also Bose Corp. v. Ejaz*, 732 F.3d 17, 22 (1st Cir. 2013) ("Fraud is

an affirmative defense that must be pleaded with particularity."); *Massey-Ferguson, Inc. v. Bent Equip. Co.*, 283 F.2d 12, 14–15 (5th Cir. 1960) (observing that allegations of fraud as a defense must be pleaded with particularity under Rule 9(b)); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 1274 & 1297 (3d ed. 1998) (reiterating that affirmative defenses dealing with fraud are subject to the heightened pleading requirements of Rule 9(b)).

Just Born's affirmative defenses all sounded in fraud and thus had to be pleaded with the particularity required by Rule 9(b). In making this assessment, we look beyond each defense's label to its substance in order to ascertain if it actually sounds in fraud. *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) ("Rule 9(b) refers to 'alleging fraud,' not to causes of action or elements of fraud. When a [party] makes an allegation that has the substance of fraud, therefore, he cannot escape the requirements of Rule 9(b) by adding a superficial label[.]"). As noted, Just Born's asserted defenses were "fraudulent[] and/or intentional[] induce[ment]"; "fraudulent and/or intentional material misrepresentations"; unjust enrichment; unclean hands; and "legally defective and unlawfully imposed" placement into critical status, creation of the rehabilitation plan, and implementation of the schedule. J.A. 82. As the district court correctly summarized, the theory Just Born pleaded to support each of these defenses sounded in fraud:

> [These] defenses pertain to the validity of the Fund's certified critical status. [Just Born] contends that . . . the Fund's actuary "falsely and fraudulently" revised its actuarial assumptions in order to certify the Fund as being in critical status, thereby allowing the Fund to reduce benefits as part of a rehabilitation plan. The crux of its argument is that the Fund's critical status should never have been certified.

16

*\*\*\**

> Each of these defenses is dependent on [the Pension Fund] having fraudulently or intentionally misrepresented the Fund being in critical status as "required []or authorized by ERISA."

*Just Born*, 2017 WL 511911, at *9.[9]

Just Born's amended answer failed to plead its allegations of fraud to support its defenses with sufficient particularity. The Rule 9(b) standard requires a party to, "at a minimum, describe 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.' These facts are often 'referred to as the who, what, when, where, and how of the alleged fraud.'" *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). Instead of alleging these necessary particular facts, Just Born broadly accused the "plaintiffs" of "manipulat[ing] actuarial assumptions, departing from past practice in analyzing the Pension Funds health," for the purpose of "obtain[ing] certification of 'critical status.'" J.A. 77.

However, Just Born did not specify who it was accusing of which specific misrepresentations. Just Born's allegations "variously refer[] to the actions taken by the actuary, the Fund, [and] the Trustees" without detailing "who allegedly knew what" or when. *Just Born*, 2017 WL 511911, at *10. This ambiguity makes it difficult to follow

---

[9] Just Born claims that its inducement and misrepresentation claims should survive because it labeled them as "fraudulent and/or intentional" behavior. That position ignores that fraudulent conduct can be either intentional or reckless conduct, so that an allegation of fraudulent conduct encompasses intentional conduct as well. *See, e.g.*, *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 469 (4th Cir. 2001).

17

the precise nature of the alleged fraud, and thus falls short of the applicable pleading standard.

In addition, Just Born's allegations do not explain why the complained-of changes were false or misleading. Put another way, Just Born failed to allege particularized facts demonstrating the requisite misrepresentations and deception to support its defenses. The mere fact of a change in actuarial assumptions or the motive for moving the Pension Fund into critical status does not suffice; instead, Just Born had to allege specific facts demonstrating that the alleged conduct causing the change was *unreasonable*.[10] The critical-status determination involves judgment calls about future fund health, and courts accord such judgment a "wide range of 'reasonableness.'" *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1348 (7th Cir. 1992) (discussing different ERISA provisions that require similar approximations of future fund health). Put another way, the law recognizes that "[r]easonableness is a zone, not a point," *id.* at 1351, and projections of a pension fund's future health necessarily involves decisions others may have made differently. *See, e.g.*, *Combs v. Classic Coal Corp.*, 931 F.2d 96, 99–100 (D.C. Cir. 1991) (discussing different ERISA provisions that also rely on reasonable

---

[10] Although § 1085 identifies the criteria for when a multiemployer plan is in critical status, it defers to the actuary's judgment as to when some of those benchmarks are met. For example, a critical-status determination is based in part on both the present value of "*reasonably anticipated employer contributions* for the current plan year and each of the 6 succeeding plan years" as well as the present value of "all nonforfeitable benefits *projected to be payable under the plan* during the current plan year and each of the 6 succeeding plan years." 29 U.S.C. § 1085(b)(2)(A)(ii) (emphases added). In making those determinations, the PPA requires only that an actuary's assumptions be "based on reasonable actuarial estimates, assumptions, and methods," not that they avoid triggering a critical-status determination if at all feasible. § 1085(b)(3)(B)(i).

18

actuarial assessments and observing that "[g]reat differences of opinion exist as to actuarial methods" and that Congress' focus on reasonableness "permits the actuary wide latitude" in undertaking its duties).

Recognizing that there is an acceptable range of calculation, ERISA only requires that an actuary's projections relating to the fund's health "be based on reasonable actuarial estimates, assumptions, and methods that . . . offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1085(b)(3)(B)(i). As the district court observed, "[f]or [Just Born] to show that the need for a rehabilitation plan was fraudulent and 'neither required nor authorized by ERISA', it must attack the reasonableness of the actuary's assumptions, not the alteration of the assumptions or the motivations behind the alterations." *Just Born*, 2017 WL 511911, at *9 (citation omitted). Just Born's amended answer does not provide the sort of specific allegations aimed at this question that would allow its affirmative defenses to withstand the Pension Fund's motion for judgment on the pleadings.[11]

---

[11] On appeal, Just Born points to two allegations as containing the requisite specificity: that using two different interest rates was "in contravention of the usual assumption that administrative expenses and employer contributions are uniformly distributed during a given year," and that the Pension Fund "evidently did not factor in the withdrawal liability that employers would owe in the event that they ceased participation in the Pension Fund" when they forecasted future contributions. Opening Br. 49. These allegations suffer from the same misperception already described: something different from the "usual" is not a foundation for fraud in this context any more than the mere failure to take something into account when undertaking one's duties is. Just Born never specified how these changes amounted to fraud and, therefore, they do not satisfy Just Born's burden under Rule 9(b).

For these reasons, the district court did not err in concluding Just Born did not plead its affirmative defenses with sufficient particularity to withstand the Pension Fund's motion for judgment on the pleadings.

## III.

For the reasons set out above, we affirm the district court's judgment.

*AFFIRMED*